**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-00184

**MEEPER, LLC**,
a Delaware limited liability company,

        Plaintiff,

   v.

**LEWIS ROCA ROTHGERBER CHRISTIE, LLP**,
an Arizona Limited Liability Partnership,
**KRISTIN M. BRONSON**,
an individual and Colorado resident, and
**TREVOR H. BARTEL**, an individual and
Colorado resident,

        Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

COMES NOW Plaintiff Meeper, LLC, by and through its undersigned counsel, Underhill Law, P.C., and co-counsel, Udall Shumway, PLC, and submits its Complaint against Defendants Lewis Roca Rothgerber Christie, LLP, Kristin M, Bronson, and Trevor Bartel.

## <u>Parties</u>

1.    Plaintiff Meeper, LLC, is a Delaware Limited Liability Company authorized to do business in Colorado. It has a registered agent address of 1685 South Colorado Boulevard, Unit S, #221, Denver, Colorado 80222 and a principal place of business located at 2207 East Concord Pike, #521, Wilmington, Delaware, 19806.   Meeper's sole member is Dr. Inna Oganzhanova.

2.      Defendant Lewis Roca Rothgerber Christie, LLP (Law Firm), is an Arizona Limited Liability Partnership authorized to do business in the state of Colorado, with a registered agent of Brian J. Spano located at the Law Firm's Denver office at 1200 Seventeenth Street, Suite 3000, Denver, Colorado 80202, and a principal place of business located at 40 North Central Avenue, Phoenix, Arizona 85004.

3.      The Law Firm is the surviving entity resulting from a merger between Rothgerber, Johnson & Lyons, LLP (the Rothgerber firm), and Lewis and Roca, LLP (Lewis and Roca).

4.      Defendant Kristin M. Bronson is a Colorado resident and an attorney licensed to practice law in the state of Colorado.  She has a current business address of 201 W. Colfax Avenue, Denver, Colorado 80202.  At all relevant times she had a business address of 1200 Seventeenth Street, Suite 3000, Denver, Colorado 80202. At all relevant times she was a partner and employee of the Rothgerber firm and subsequently was a partner and employee of the Law Firm.

5.      Defendant Trevor H. Bartel is a Colorado resident and an attorney licensed to practice law in the state of Colorado.  He has a business address of 1200 Seventeenth Street, Suite 3000, Denver, Colorado 80202.   He was an employee of the Rothgerber firm and currently is an employee of the Law Firm.

**<u>Jurisdiction and Venue</u>**

6.      This Court has diversity jurisdiction over this matter under 28 U.S.C. § 1332 because the controversy is between citizens of different states and exceeds the minimum jurisdictional amount of $75,000, exclusive of interests and costs.   The claims asserted are

brought by Plaintiff, a Delaware limited liability company, against Defendants who are Arizona and Colorado residents.

7.      Venue is proper under 28 U.S.C. § 1391(a)(1) and (2) because the individual Defendants reside in the District of Colorado, the underlying lawsuit in which the improper conduct occurred was litigated before the District Court of the State of Colorado, and the facts of that underlying property lawsuit concerned a property dispute in the District of Colorado.

## General Allegations

I.      The Underlying Property Dispute.

8.      Around 2005, Meeper was interested in purchasing rural land in Southern Colorado from the Lester family for future use and development.   The land Meeper was buying was a portion of the Lesters' existing property.   Meeper also contracted for water rights from the Lesters and purchased water rights from them.

9.      Meeper hired Suzy Woodward of United County Premier Brokers as realtor, Charles C. Powers as real estate counsel and as title agent, and Dave Maley of Davis Engineering Services as surveyor.   All of the professionals involved knew that Meeper's plan was to use the land for productive purposes.   Meeper needed adequate wet water rights, access to the property from developed roads, and a proper legal description of the land suitable for future use.

10.      Professionals, including lawyers, title agents, real estate agents, and surveyors involved in the development of rural land in Colorado are aware or should reasonably be aware of these requirements.   But, none of the professionals inspected the historical water use on the property or recommended that Meeper hire a professional water lawyer or consultant to

investigate the water rights that were to be sold with the land or determine how much usable water actually existed.

11.     While there was a road leading to the land Meeper was purchasing, and the Lesters did possess a recorded easement, it was uncertain whether the easement actually described the existing road.   None of the professionals Meeper hired warned Meeper that there was a question about whether the easement the Lesters held ran over the existing road.

12.     When the sale was ready to close, Mr. Powers put an incorrect legal description of the property on the deed and failed to ensure that the Lesters were conveying what easements they did have.

13.     Unaware of these problems and relying on the professionals, Meeper closed the sale and purchased a portion of the Lesters' property on December 2, 2005.

14.     Meeper obtained title insurance from Attorneys Title Guaranty Fund, Inc. (Attorneys Title), which employed Mr. Powers as an agent.   Mr. Powers did not explain his conflict of interest as both advisor and counsel to Meeper but also as the agent for Attorneys Title.   Mr. Powers did not advocate for Meeper in obtaining extended coverage or other coverage that would have prevented Attorneys Guaranty from disputing coverage for problems with the legal description, water, or access.

II.     The Rothgerber Firm is Hired to Review the Real Estate Transaction.

15.     After the sale, Meeper became aware of problems with access to its property and the improper legal description.   Meeper also came into conflict with owners in the neighboring Pinon Hills development related to access to Meeper's property.

16.     In the Spring of 2012, Dr. Ogandzhanova approached Kristin Bronson of the Rothgerber firm regarding the problems with Meeper's property.   Dr. Ogandzhanova explained to Ms. Bronson that Meeper's goal was to put the property to productive use, such as development or ranching.   She explained the background of the dispute with the Pinon Hills owners, the Lesters, and the various professionals who were involved in the sale.

17.     Dr. Ogandzhanova asked Ms. Bronson to examine the entire purchase transaction and ensure that anything that needed to be corrected was corrected, so that productive use of the property could proceed.

18.     The Rothgerber firm was experienced in real estate transactions in Colorado and knew or should have known that, for any development to occur, Meeper would need at least undisputed access, correct title to the land it had purchased, and sufficient usable water and water rights.

19.     In violation of their duties to Meeper, Defendants did not investigate whether Meeper had sufficient useable water and water rights, warn Meeper of the issue, or inform Meeper that it was not investigating that issue.

20.     At the time it was hired, the Rothgerber firm already represented Gran Poder, one of the Pinon Hills owners.   Ms. Bronson was aware that Meeper was adverse to those owners, directly or indirectly, because there was a conflict concerning the use of the roads over the Pinon Hills and Meeper properties.

21.     In violation of their duties to Meeper, Ms. Bronson did not decline representation or ensure that Meeper obtained independent legal advice.   Instead, Ms. Bronson told Dr. Ogandzhanova that Meeper could not get an access easement against the Pinon Hills owners,

only against Mrs. Lester, advised Meeper to exclude Pinon Hills from the scope of the Rothgerber firm's engagement, and requested that Dr. Ogandzhanova waive the conflict of interest involving her existing client.   Meeper relied on and accepted Ms. Bronson's advice.

22.     The scope of the Rothgerber firm's representation included assessing and resolving all issues that might have arisen from the 2005 sale, with the goal of ensuring Meeper's development or other use could go on as planned and to insure that there were no any other problems that could interfere with any use of the property.

III.     The Rothgerber Firm Expands the Representation to Litigation.

23.     Ms. Bronson represented Meeper with the assistance of Trevor Bartel.

24.     The Rothgerber firm's strategy was to file a claim with Meeper's title insurance company and file a lawsuit against Joyce Lester and the professionals with the goal of obtaining a new easement across the rest of the Lester property, where there was no existing road, from Mrs. Lester and recover sufficient money damages against the professionals to pay for the construction of a road across that new easement.

25.     On information and belief, in violation of their duties to Meeper, Defendants did not investigate the existence of all of the legal claims that Meeper could have asserted against Mrs. Lester and the other defendants before filing the lawsuit.   They did not evaluate whether Mr. Powers or any other proposed defendant had appropriately investigated whether sufficient useable water and water rights would be conveyed.   Nor did they warn or advise Meeper on the same when evaluating the claims to be asserted in the litigation.   Defendants did not investigate whether the Lester family had delivered the water and water rights for which Meeper had

contracted.   Nor did Defendants warn Meeper about the water issue, or inform Meeper that it was not investigating that issue.

26.     On July 3, 2012, the Rothgerber firm filed a lawsuit in the U.S. District Court for the District of Colorado on behalf of Meeper against Joyce Lester and the professionals.  *See Meeper, LLC v. Lester, et al.*, Case No. 1:12-CV-01732-WYD-KMT (D.Colo. 2012).   The complaint did not name Attorneys Title, any of the Pinon Hills owners, the individuals who had sold the land to the Lesters, or any John Does.   There was no claim asserted against Mrs. Lester to use of the existing road.

27.     Defendants did not assert any claims regarding the Lesters' failure to convey adequate usable water and water rights or their representations to Meeper about the usable water for the land.   Nor did Defendants warn Meeper of the adequacy of water issue, inform Meeper that they were not investigating that issue, or explain the consequences of failing to timely bring such a claim.

28.     Defendants did not retain consulting experts to examine the real estate transaction or the potential claims or obtain certificates of review for the claims asserted against the professionals.

29.     Attorneys Title denied coverage but agreed to hire an attorney for Meeper to obtain an access easement, and it hired Carpenter & Klatskin, P.C.   The Carpenter firm specifically only represented Meeper in regard to the access issue.   Defendants continued to represent Meeper on this issue as co-counsel with the Carpenter firm and continued to represent Meeper on the other issues that it previously had been hired to address.

IV.     The Rothgerber Firm Conceals Merger Discussions.

30.     In February 2012, MetLife filed a declaratory judgment action in Arizona seeking a determination that Dr. Ogandzhanova was not disabled to work in her own occupation.   In that action, MetLife was represented by Lewis and Roca.

31.     The Arizona lawsuit involved extensive examination of Dr. Ogandzhanova's mental and emotional conditions and her financial circumstances, and included voluminous discovery disputes over her disclosure of information related to her alleged investments.

32.     Throughout Meeper's Colorado lawsuit, Dr. Ogandzhanova confided to Ms. Bronson and Mr. Bartel facts about her fragile emotional and mental states.   Trusting her counsel to keep these communications confidential, Dr. Ogandzhanova told her lawyers that the passing of her son had devastated her, and the fact that MetLife was suing her, claiming she was lying about the severity of her distress, was too much for her to bear.

33.     The Rothgerber firm also was aware of Dr. Ogandzhanova's financial status, including at least her payment history and her ability to purchase Colorado real estate.

34.     This information would be relevant and useful to Lewis and Roca in the Arizona lawsuit against Dr. Ogandzhanova.

35.     The information known to the Rothgerber firm, Ms. Bronson, and Mr. Bartels concerning Dr. Ogandzhanova's emotional ability to keep fighting with MetLife and her financial situation was protected and confidential under attorney-client privilege and otherwise.

36.     Prior to November 2012, the Rothgerber firm and Lewis and Roca began talks about a merger.   Meeper and Dr. Ogandzhanova were unaware of the discussions and could not have been aware of them at the time.

37.     By November 2012, the MetLife lawsuit in Arizona had proceeded into discovery, and Lewis and Roca was taking Dr. Ogandzhanova's deposition.

38.     On November 28, 2012, Dr. Ogandzhanova was in Lewis and Roca's Phoenix, Arizona office for her deposition.   To her surprise, she ran into Ms. Bronson during a break in the deposition.   Dr. Ogandzhanova told Ms. Bronson that she was in Lewis and Roca's offices having her deposition taken in a lawsuit.

39.     Ms. Bronson told Dr. Ogandzhanova that she was there to attend a "real estate conference."   In later e-mails, Ms. Bronson described the Arizona meeting as "business meetings[,]" and described running into her client as "very random."   Meeper and Dr. Ogandzhanova accepted these representations and had no reason to doubt them.

40.     Defendants knew or should have known after Ms. Bronson encountered Dr. Ogandzhanova at Lewis and Roca's Phoenix office that the potential merger would lead to a conflict of interest, and also that the fact of the possibility of a merger of the two firms would be material to Meeper and Dr. Ogandzhanova.

41.     In violation of their duties, Defendants did not disclose the possibility of a merger between the Rothgerber firm and Lewis and Roca to Meeper or Dr. Ogandzhanova after the November 28, 2012, deposition, or even after the firms reached a firm decision to merge.

V.      The Rothgerber Firm Encourages Settlement.

42.     The Rothgerber firm's attitude towards Meeper's lawsuit in Colorado changed in a way that was consistent with a motivation to finish and close out the Meeper representation quickly, before the merger was consummated.

43.     In October 2012, Ms. Bronson suggested to Meeper that Meeper dismiss its claims against the individual professionals without prejudice while they mediated with Mrs. Lester on the access and title issues. Meeper agreed to mediate the dispute with Lester but did not agree to dismiss Meeper's claims against the professionals.

44.     Mr. Bartel represented Meeper at an in-person mediation of the lawsuit in February 2013.   At mediation, Mr. Bartel counseled Meeper  that:   (1) Meeper's claims against Ms. Woodward were weak because she was hired as only a "transaction broker;"   and (2) Meeper should agree to release all of its claims, known and unknown, against Mrs. Lester in return for a new, undeveloped easement and a corrected property description, but no money.

45.     In violation of their duties, Defendants did not advise Meeper of the danger that signing a mutual release with Mrs. Lester would prevent Meeper from ever pursuing any claims it might have against the sellers of the land and water rights based on other, unknown issues, such as inadequate water or water rights or misrepresentation about the water, or advise Meeper that such other unknown issues might affect Meeper's best use of the land.

46.     Based on the Rothgerber firm's advice, and ignorant of the rights it was giving up, Meeper executed universal, mutual releases with Ms. Woodward and with Mrs. Lester. In exchange, Meeper was given an easement over the Lester property that was unimproved, and which was an inadequate replacement for the access Meeper had bargained for with the Lesters, but which relieved Lawyers Title of any risk it had that Lawyers Title would be required to either litigate at its expense to provide Meeper the access it bargained for or pay damages for Meeper's lack of access.

47.    Following mediation, the Rothgerber firm continued to encourage prompt settlement with the remaining defendants, without success.

48.    As the date for the merger between the Rothgerber firm and Lewis and Roca grew nearer, in June and July of 2013, Ms. Bronson began sending Meeper weekly dunning letters demanding payment of the firm's outstanding invoices if the Rothgerber firm was to do any more work for Meeper.   Rothgerber was paid in full.   Rothgerber did not terminate the representation based on alleged nonpayment.

49.    In continuing violation of their duties, Defendants did not reveal the coming merger to Meeper during the time the Rothgerber firm and the other Defendants were representing Meeper in the settlement discussions or while demanding payment of invoices.

VI.    <u>Meeper Discovers the Secret Merger</u>.

50.    On July 24, 2013, the Rothgerber firm and Lewis and Roca for the first time publicly announced the coming merger.

51.    Three days later, Ms. Bronson announced to Dr. Ogandzhanova that the Rothgerber firm had to withdraw from her representation due to a conflict of interest. Bronson withheld her notice of the conflict until after she had ensured that her demands that Meeper become current on its invoices was met. The Law Firm then filed its motion to withdraw, and ultimately completed the merger on September 1, 2013.   On October 9, 2013, the Colorado District Court granted the Law Firm's motion to withdraw, noting that it was doing so because there was now a "conflict of interest[.]"

52.    The day after it was allowed to withdraw from the Colorado lawsuit, the newly merged Law Firm filed a voluminous motion for sanctions against Dr. Ogandzhanova in the

Arizona lawsuit, asking that her claims for bad faith and punitive damages against the insurance carrier be dismissed.  The motion followed an extensive discovery dispute during which the Law Firm and its predecessor, Lewis and Roca, had been actively seeking to undermine Dr. Ogandzhanova at the same time that the Law Firm and the other Defendants were representing Meeper in Colorado.

53.     In violation of its duties, the Law Firm had been actively working against the interests of Meeper and Dr. Ogandzhanova by preparing a dispositive motion adverse to Dr. Ogandzhanova at the same time as it was representing Meeper in Colorado and while it still had access to confidential information that was material to the Metlife dispute in Arizona.

54.     After learning of the merger, Dr. Ogandzhanova's attorney in the Arizona litigation contacted the opposing attorney at the Law Firm, Stephen Bressler, to raise the issue of the conflict of interest caused by the merger.

55.     Mr. Bressler admitted that "he was aware of the situation, but that Rothgerber represented Meeper and not Dr. Ogandzhanova" and that "Rothgerber planned to withdraw from its representation of Meeper before" the merger was complete.

56.     Dr. Ogandzhanova filed a motion to disqualify the Law Firm in the Arizona litigation, and the United States District Court ultimately did so.   In so doing, the Arizona Court described the actions of the merging firms in withering language:

> Here, LRR [the Firm] represented Meeper and Ogandzhanova at the same time it
> represented Plaintiff [MetLife] in its current suit against Ogandzhanova.  LRR
> opted to drop Meeper and Ogandzhanova, like a "hot potato," in order to retain
> MetLife, a longstanding and presumably more lucrative client.

*   *   *

> [T]his case appears to be one in which a law firm underwent a merger despite
> knowing it would create an ethical conflict.  LRR then, post-merger, dropped
> Meeper, a small and less lucrative client, in an attempt to continue its
> representation of MetLife, a more lucrative and potentially long-term client.
> This behavior justifies the public in viewing the legal profession as valuing its
> own gain more than client loyalty.

57.     The Arizona Court explained that Dr. Ogandzhanova was prejudiced by, among other things, the fact that Ms. Bronson would have "seen firsthand many of her business behaviors, moods, affect, and difficulty working with others" and "observed her mental and cognitive status... and her hardships and losses that go to the heart of her disability claim" and that such knowledge would be helpful to MetLife in its action against her.

VII.    Efforts of Successor Counsel.

58.     Meeper hired Choquette & Hart, LLP as successor counsel. The Choquette firm needed about three months to obtain documents from the Law Firm as predecessor counsel and to review and understand them, consider the filing of additional claims that had not yet been asserted by the Law Firm, and otherwise come up to speed and prepare the case as it should have been prepared originally.  During this "ramp up" period, Meeper had to pay the Choquette firm's attorney fees to replicate work the Rothgerber firm had done or should have done earlier.

59.     The Choquette firm hired an expert to investigate the issue of the usable water and water rights associated with the property.  In December 2014, one of the experts reported

that the Lesters may have fraudulently misrepresented facts related to the historical water use that, in function, meant Meeper did not obtain the useable water it thought it had.

60.     The Choquette firm hired an expert to investigate the value of Meeper's water rights.   The firm obtained a report on January 30, 2015, that revealed that Meeper had dramatically less usable water than the Lesters had represented.   The value of the water rights that were promised by the Lesters, but not actually conveyed, was $1,400,000.00 or more.

61.     Meeper tried to amend its complaint to assert claims concerning the lack of usable water rights.   The Court denied the motion to amend based on the release of Meeper's claims against Mrs. Lester in the settlement and the dismissal of Meeper's claims against Mrs. Lester that had already been entered, all of which were consequences of Defendants' advice to Meeper.

62.     The underlying lawsuit since resolved by way of mutual dismissals.

63.     Meeper estimates that it has paid successor counsel more than $408,953.47 in attorney fees to come up to speed on the case or duplicate work done by the Rothgerber firm, to advise Dr. Ogandzhanova, Meeper's member and manager, on the effects of the Rothgerber firm's actions, and mitigate damages caused by the Rothgerber firm.

## FIRST CLAIM FOR RELIEF
### Legal Malpractice - Duty of Care
### (*Against all Defendants*)

64.     Plaintiff incorporates all other allegations in this Complaint as if set forth here.

65.     There was an attorney-client relationship between Meeper, LLC, on one hand, and the Law Firm, Ms. Bronson and Mr. Bartel, on the other.

66.     As a result of the attorney-client relationship, the Law Firm and its attorneys owed a duty of care to Meeper.   The duty of care encompasses a duty of competence.

Attorneys owe clients a duty to employ that degree of knowledge, skill, and judgment ordinarily possessed by members of the legal profession in representing the client.

67.     The Law Firm and its attorneys violated their duty of care.

68.     As a result of Defendants' violations of duty, Meeper was damaged.

69.     Meeper's damages include, among other items, the loss of Meeper's ability to obtain adequate water and water rights for the Colorado land or damages related to the same, the cost to hire subsequent counsel to take over the case from the Law Firm, including the cost to duplicate or seek to correct work done by the Rothgerber firm following the improper conflict of interest the Rothgerber firm created, and other damages.

WHEREFORE, Plaintiff seeks the relief set forth in this Complaint.

## SECOND CLAIM FOR RELIEF
### Breach of Fiduciary Duty - Duty of Undivided Loyalty
### (*Against all Defendants*)

70.      Plaintiff incorporates all other allegations in this Complaint as if set forth here.

71.     In addition to and separate from the duty of care, attorneys owe their clients a duty of undivided loyalty.

72.     Defendants violated their duty of loyalty.  Among other things, they chose to merge with a law firm adverse to their client and dumped Meeper for MetLife.

73.     Defendants preferred their own self-interests and the interest of their other clients ahead of those of Plaintiff`.

74.     As a result of Defendants' actions, Plaintiff was damaged.

WHEREFORE, Plaintiffs seeks the relief set forth in this Complaint.

### THIRD CLAIM FOR RELIEF
**Breach of Fiduciary Duty - Duty of Confidentiality**
(*All Defendants*)

75.     Plaintiff incorporates all other allegations in this Complaint as if set forth here.

76.     Attorneys owe a duty of confidentiality to their clients.   This includes but is not limited to respecting clients' attorney-client privileges.

77.     Defendants violated their duty of confidentiality.

78.     Among other duties, Defendants had a duty not to disclose privileged or confidential information to Plaintiff's opposing counsel.   On information and belief, they violated this duty when the merger changed Plaintiff's own counsel into opposing counsel. Upon information and belief, the merger between the Rothgerber firm and Lewis and Roca exposed and made available all of Plaintiff's confidential information to the attorneys representing MetLife, an opposing party.

79.     The Law Firm's attorneys who had not previously represented Plaintiff had a duty to notify Plaintiff upon the discovery that they had been exposed to Plaintiff's confidential information and to take reasonable steps to avoid coming into contact with that information.

80.     Additionally, upon information and belief, the attorneys in the Rothgerber firm shared information concerning Plaintiff with attorneys at Lewis and Roca prior to the merger. During even preliminary merger discussions, law firms routinely check for conflicts, and attorneys at the Rothgerber firm and Lewis and Roca here must have done so.

81.     At a minimum, Defendants disseminated enough information about Plaintiff to Lewis and Roca to enable them to decide the merging firms would prefer to represent MetLife instead of continuing to represent Plaintiff after the merger.

82.     Defendants otherwise violated their duty of confidentiality.

83.     As a result, Plaintiff was damaged.

WHEREFORE, Plaintiff seeks the relief set forth in this Complaint.

## FOURTH CLAIM FOR RELIEF
### Misrepresentation and Omission in a Business Transaction
### (*Against the Law Firm and Ms. Bronson*)

84.     Plaintiff incorporates all other allegations in this Complaint as if set forth here.

85.     Ms. Bronson and the Rothgerber firm owed duties to Meeper.   These included a duty to refrain from misrepresentations in a business transaction.   These also included a duty to refrain from negligent omissions in communications with Meeper.

86.     Defendants made a misrepresentation to Meeper.   When Meeper's owner asked Ms. Bronson about her presence in Lewis and Roca's offices, Ms. Bronson said she was there for a "real estate conference" or a "business meeting," when in fact she was there to discuss a merger of the Rothgerber firm and Lewis and Roca.

87.     Ms. Bronson knew that the representation was false when she made it.

88.     Ms. Bronson knew that the truth concerning the coming merger would be material to Meeper.

89.     Ms. Bronson made this statement and omission in her individual capacity and in her capacity as a representative of the Rothgerber firm.

90.     Defendants failed to exercise reasonable care or competence in communicating information.   Defendants failed to inform Plaintiff of the coming merger.

91.     Defendants further advised Meeper to settle and release her claims against other parties without informing Meeper of the pending merger or the resulting conflict of interest.

92.     Meeper, ignorant of the true facts, justifiably relied on the fact that Defendants were remaining loyal and not creating a conflict of interest.  This reliance included, without limitation, paying all invoices issued by Defendants, failing to take action to protect itself from the danger and conflict of interests created by the merger, and by relying on Defendants' advice to settle the Lester claims, among other reliance.

93.     Defendants provided and withheld the information described above with the intention that Meeper would so rely.

94.     As a result, Meeper was damaged.

WHEREFORE, Plaintiff seeks the relief set forth in this Complaint.

**FIFTH CLAIM FOR RELIEF**
**False Statement and Fraudulent Omission**
**(*Against the Law Firm and Ms. Bronson*)**

95.     Plaintiff incorporates all other allegations in this Complaint as if set forth here.

96.     Ms. Bronson and the Rothgerber firm owed duties to Meeper.  These included a duty to refrain from making false statements to Meeper.  They also included a duty to refrain from fraudulent omissions in communications with Meeper.

97.     Defendants made a false representation to Meeper.   When Meeper's owner asked Ms. Bronson about her presence in Lewis and Roca's offices, Ms. Bronson claimed she was there for a "real estate conference" or a "business meeting," when in fact she was there to discuss a merger of the Rothgerber firm and Lewis and Roca.

98.     Ms. Bronson knew that the representation was false when she made it.

99.     Defendants concealed information about the coming merger from Meeper.

100.    Defendants knew that the truth concerning the coming merger would be material to Meeper.

101.    Meeper, ignorant of the true facts, justifiably relied on the fact that Defendants were remaining loyal and not creating a conflict of interest.  This reliance included, without limitation, paying all invoices issued by Defendants, failing to take action to protect itself from the danger and conflict of interests created by the merger, and by relying on Defendants' advice to settle the Lester claims, among other reliance.

102.    Defendants provided and withheld the information described above with the intention that Meeper would so rely.

103.    Defendants' conduct was willful and wanton, heedless and reckless, and was undertaken without regard to consequences to, or of the rights of, Plaintiff.

104.    As a result, Meeper was damaged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment for Plaintiff and against the Defendants in an amount to be determined at trial, including damages equal to:   (1) the value of the useable water and water rights that could not be recovered in the first Colorado lawsuit; (2) the difference between the expense Meeper incurred to obtain the undeveloped easement from the Lesters and construct a road, on the one hand, and the expense Meeper would have incurred to obtain an easement over the existing road from Pinon Hills, on the other; (3) attorney fees and costs paid to mitigate damage; (4) disgorgement of attorney fees paid to Defendants; (5) prejudgment interest, attorney fees, and costs as permitted by law or contract; and (6) other damages to be determined as made appropriate by discovery in this case.

**<u>RIGHT TO AMEND</u>**

Plaintiff hereby respectfully reserves the right to amend this Complaint, including the claims and damages stated, under the Federal Rules, as additional or supplemental facts and information become known or for any other reason.

**<u>JURY DEMAND</u>**

PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES, ANY ASSERTED COUNTER-CLAIMS AND/OR ANY AND ALL CLAIMS, DEFENSES OR ISSUES PRESENTED BY EITHER PARTY SO TRIABLE.

THIS JURY DEMAND INCLUDES THOSE CLAIMS NOT YET SET FORTH AS MAY BE AMENDED INTO THIS COMPLAINT AT A LATER DATE.

DATED: January 19, 2017

*S/ Colin E. Moriarty*
Joanne P. Underhill, #16690
Colin E. Moriarty, #36865
Underhill Law, P.C.
7350 East Progress Place, Suite 110
Greenwood Village, Colorado 80111
Telephone: (303) 721-7112
E-mail: filings@underhilllaw.com
*Attorneys for Plaintiff Meeper, LLC*

*S/ Joel E. Sannes*
Joel E. Sannes
Udall Shumway, PLC
1138 South Alama School Road, Suite 101
Mesa, AZ 85253
Telephone: (480) 461-5300
E-mail: jes@udallshumway.com
*Attorneys for Plaintiff Meeper, LLC*

<u>Domestic Address for Plaintiff Meeper, LLC</u>:
1685 South Colorado Boulevard, Unit S, #221
Denver, Colorado 80222